IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,            )
                                     )
                  Plaintiff,         )
                                     )
v.                                   )          No. 3:22-CR-20-KAC-JEM
                                     )
JEFFREY L. SCALES,                   )
KEYASIA F. DAVIS,                    )
DESMOND L. MCDANIELS, and            )
SHARDE R. SIMMON,                    )
                                     )
                  Defendant.         )

## REPORT AND RECOMMENDATION

All pretrial motions are referred to the undersigned for disposition or recommendation as

appropriate. *See* 28 U.S.C. § 636(b).

Eleven defendants, including Jeffrey L. Scales, Keyasia F. Davis, Desmond L. McDaniels,

and Sharde R. Simmon, are charged in this case, along with unnamed others, with conspiring to

distribute four hundred grams or more of a fentanyl and one hundred grams or more of a fentanyl

analogue (Count One) [Doc. 3]. Defendants Scales, Davis, McDaniels, and Simmon are also

charged with possession of fentanyl with intent to distribute (Count Three) and possession of

firearms in furtherance of drug trafficking (Count Four), both allegedly occurring on November

10, 2021 [*Id.*]. Defendant Scales is further charged with being a felon in possession of a firearm

on that date (Count Five) [*Id.*]

On November 10, 2021, officers observed the occupants of a Jeep Cherokee and the driver

of a Chevy pickup truck engage in a suspected drug transaction in a mall parking lot. Both vehicles

sped away, and officers followed each. An officer stopped the truck, and the driver told them he

was purchasing heroin from the people in the Jeep, who are known to carry guns. The officer who stopped the truck radioed to other officers to stop the Jeep. After stopping the Jeep, officers removed the driver Scales, and the passengers, Davis, McDaniels, and Simmon, one at a time, frisked them, and handcuffed them. At least twenty-five minutes after the stop, a K-9 unit arrived on the scene, and the drug detection dog alerted on the Jeep. Officers searched the Jeep and seized suspected heroin, cash, marijuana, handguns, and cellphones. A search of Davis's person yielded additional heroin. That evening, law enforcement searched an apartment at Aldergate Way, which was the residence of Scales and Davis, pursuant to a search warrant, and law enforcement seized suspected heroin, marijuana, a ledger, cash, cellphones, and firearms.

This case is before the undersigned for report and recommendation on Defendant Scales's Motion and Memorandum to Suppress Evidence Seized at 9310 Aldergate Way, Apt. #4107 [Doc. 132]. Codefendants Davis [Doc. 133] and McDaniels [Doc. 136] seek to join in this motion. Also before the Court is Defendant Davis's Motion and Memorandum of Law to Suppress Evidence Seized as the Result of a Traffic Stop [Doc. 134]. Defendants Scales [Doc. 135], McDaniels [Doc. 136], and Simmon [Doc. 137] move to adopt this motion. The Government responds in opposition to both motions to suppress [Doc. 170], and Defendant Scales filed a reply [Doc. 177].

After reviewing the evidence, the arguments of the parties, and the relevant law, the undersigned finds officers had reasonable suspicion to conduct an investigatory stop of the Jeep. The officers properly frisked and handcuffed the occupants based on their reasonable belief that the occupants were armed and dangerous. The stop of the Jeep was not unduly prolonged, and the officers had probable cause to search the Jeep based on an alert by a drug detection dog. The undersigned also finds that the search warrant for the Aldergate Way apartment was not validly

issued because the supporting affidavit fails to provide a nexus between the apartment and drug trafficking and the information that controlled substances are stored in the apartment is stale. The undersigned concludes that the evidence seized in the execution of the search warrant need not be suppressed, however, because the officers relied on the search warrant in good faith. The undersigned therefore recommends that the District Judge deny Defendants' suppression motions.

## I.     SUMMARY OF THE EVIDENCE

The parties appeared before the undersigned on August 23, 2022, for an evidentiary hearing on Defendant Davis's motion to suppress and argument on Defendant Scales's suppression motion.[1] Assistant United States Attorney Brent Nelson Jones appeared on behalf of the Government. Attorney Robert R. Kurtz represented Defendant Scales; Attorney Mark E. Brown represented Defendant Davis; Attorney Michael Thomas Cabage represented Defendant McDaniels; and Attorney Ashlee Brooke Mathis represented Defendant Simmon. All four Defendants were also present.

At the evidentiary hearing, the Government presented the testimony of Investigator Evan Rogers, who testified that on November 10, 2021, he worked for the Knox County Sheriff's Office ("KCSO") as a detective in the Organized Retail Crime Task Force [Doc. 229 p. 10]. On that date, multiple officers responded to a report of shoplifting at West Town Mall but did not apprehend the shoplifter [*Id*. at 11]. As he and other officers were in the parking lot preparing to leave, he noticed an older model pickup truck that seemed suspicious because it was parked away from other shoppers [*Id*.]. Investigator Rogers began surveillance on the truck [*Id*.]. He stated that he was two or three rows away from the truck and that other officers were in the area [*Id*. at 12].

---

[1]     The transcript of the August 23, 2022 evidentiary hearing was filed on October 3, 2022 [Doc. 229].

3

Investigator Rogers stated that within a few minutes, a newer model, white Jeep parked beside the truck, and he saw what he believed was a quick hand-to-hand transaction between the truck and the Jeep [*Id*.]. Investigator Rogers said he saw a hand extend out of the window of the truck and be drawn back into the truck, and then he saw both vehicles drive away recklessly and at a high rate of speed [*Id*. at 12–13]. Investigator Rogers said based on his training, education, and experience, he believed these actions to be a hand-to-hand drug transaction [*Id.*].

Investigator Rogers stated that he pursued the truck, which he believed contained the drug dealer, to the other side of the mall and conducted a traffic stop [*Id*. at 13]. He approached the truck, identified himself, and began an investigation [*Id*.]. According to Investigator Rogers, the driver said he was there to purchase drugs from his dealer, who was in the white Jeep, and that the Jeep contained a lot of drugs [*Id*. at 14]. The driver of the truck told Investigator Rogers that the Jeep contained multiple people and that they were armed [*Id*.]. The driver said the occupants of the Jeep told him to follow them to another location to receive the drugs [*Id.*]. Based on these statements, Investigator Rogers now believed the driver of the truck had passed money to the Jeep in the mall parking lot [*Id.*]. He said due to his training and experience with drug trafficking, along with the way the driver of the truck was dressed, spoke, and interacted, Investigator Rogers believed the driver truthfully related he was in the parking lot to buy narcotics from the occupants of the Jeep [*Id.* at 13–14]. While Investigator Rogers was talking with the driver of the truck, another officer parked behind him for safety [*Id.* at 14–15].

Investigator Rogers testified that upon learning that the dealer was in the Jeep, he radioed for other officers to stop the Jeep [*Id*. at 15]. Investigator Pope responded that he was behind the Jeep and confirmed he was alone [*Id.*]. Investigator Rogers said due to concern for Investigator Pope's safety in stopping multiple individuals, whom the driver of the truck reported were armed,

he released the driver of the truck and drove with his lights and siren activated to assist Investigator Pope [*Id.* at 15–16]. Investigator Rogers arrived at the scene of the stop after Investigator Pope, who had stopped the Jeep [*Id.* at 16]. He said multiple officers equipped with body cameras responded to the scene of the stop [*Id.*]. Investigator Rogers said he remained on the scene throughout the stop and participated in the search of the Jeep [*Id.*]. After the stop of the Jeep, he assisted with the execution of a search warrant at a residence at Aldergate Way [*Id.*].

Investigator Rogers testified with regard to a video recording of the stop of the Jeep from his body camera [*Id.* at 17; Exh. 7]. He said portions of the video recording contain no audio because as an undercover or plainclothes officer, he was permitted to mute the audio when speaking with other undercover officers [*Id.* at 18].

The Government played portions of the video recording, which began at 18:55:25 [Exh. 7]. By 19:10:23, officers had removed all four Defendants from the Jeep [Exh. 7]. At 19:19, a K-9 unit arrived on the scene and performed a sniff of the Jeep [Exh. 7]. At 19:20:15, officers began searching the Jeep [Exh. 7]. At 19:34, Investigator Rogers removed a large amount of cash from the center console and photographed it [Exh. 7]. Investigator Rogers testified that he videoed the cash taken from the console for evidentiary purposes [*Id.* at 19]. He stated that at 19:33:52 on the recording [Exh. 7], he performed a records check on two firearms, but he did not recall whether the guns came back as "clean" [Doc. 229 p. 19]. Investigator Rogers stated that starting at 19:42 on the video recording [Exh. 7], law enforcement began searching the exterior of the Jeep, including the engine compartment, wheel wells, and other locations where narcotics could be hidden [Doc. 229 pp. 19–20]. At 19:46:07 on the recording [Exh. 7], he photographed the controlled substances seized during the search of the Jeep [Doc. 229 p. 20].

5

Investigator Rogers also testified about five photographs that depict evidence seized that evening and the identification cards of the four occupants [*Id.* at 21; Exh. 1–5]. The photographs depict marijuana [Exh. 1], two handguns [Exh. 2], currency, controlled substances in individual baggies, and four cellphones [Exhs. 3 & 4]. One photograph is of four identification cards: a Tennessee driver's license for Defendant Davis, listing an address of apartment number 4107 on Aldergate Way in Knoxville, Tennessee; the Michigan identification card of Defendant McDaniels with an address in Michigan; the Michigan driver's license of Defendant Scales with a Michigan address; and the Michigan identification card of Defendant Simmon with a Michigan address [Exh. 5]. Investigator Rogers stated that following the search of the Jeep, he provided information to Detective Sharp, who drafted an application for a search warrant [Doc. 229 p. 21].

The Government also admitted a second video recording from the scene of the stop and played the first four minutes of the recording [*Id*. at 22–23; Exh. 8]. This portion of the video shows the search of Defendant Davis's person and the seizure of drugs from the front of her pants [Exh. 8].

On cross-examination by Attorney Brown, Investigator Rogers testified that he was assigned to the Retail Crime Task Force during the holiday season and this was not his normal assignment [*Id.* at 23]. He confirmed that on November 10, he went to the mall to investigate shoplifting, identified no shoplifting, and was in the parking lot preparing to leave [*Id.* at 23–24]. Investigator Pope was also somewhere in the parking lot, but Investigator Rogers could not recall his location [*Id.* at 24]. Investigator Rogers said while waiting for the potential shoplifter to leave the mall, he noticed a truck that was there for an extended time [*Id.* at 25]. He said the truck was exhibiting some "indicators" that caught his attention and that, before leaving, he conducted surveillance on the truck [*Id.* at 25]. He stated that after observing a hand-to-hand drug transaction,

he saw the truck drive toward the mall exit recklessly, and he performed a traffic stop [*Id.*]. Investigator Rogers said based upon his training, education, and experience, he believed he had witnessed a drug transaction [*Id.* at 26]. He assumed that the mall was owned by a private entity, and he did not know if the parking lot had a posted speed limit [*Id.*].

Investigator Rogers said he activated his lights in the parking lot and stopped the truck in the exit to the parking lot [*Id.* at 26–27]. Investigator Rogers spoke with the driver, who was seated inside the truck [*Id.* at 27]. Investigator Rogers did not search the driver or the truck [*Id.*]. The driver told Investigator Rogers that he was in the parking lot to buy narcotics [*Id.* at 28]. Investigator Rogers then radioed other officers to stop the white Jeep because he had information that it contained drugs [*Id.*]. In the radio call, Investigator Rogers stated that the individual he stopped had reported he was purchasing narcotics, that the Jeep contained multiple people, and that the occupants of the Jeep were potentially armed [*Id.* at 29]. Investigator Rogers characterized the Jeep as suspicious because it had an out-of-state license tag [*Id.*]. He agreed the driver of the truck told him that the driver was supposed to go to another location [*Id.*]. Investigator Rogers said the driver did not mention seeing drugs or guns in the Jeep [*Id.*]. The driver did not say he was there to buy drugs from Keyasia Davis [*Id.* at 30].

Investigator Rogers stated that another officer had already stopped the Jeep on the interstate by the time he arrived on the scene [*Id.*]. None of the occupants were out of the Jeep when he arrived [*Id.*]. His role was to provide security for the other officer on the scene [*Id.*]. Investigator Rogers was not aware of any drugs or guns being found as the occupants were removed from the Jeep and frisked [*Id.* at 31]. He agreed that one of the officers asked for consent to search the Jeep [*Id.* at 31]. He affirmed that when consent was not granted, a K-9 unit was called to the scene [*Id.*]. Investigator Rogers said that while awaiting the arrival of the K-9 unit, the officers on the scene

were checking the driver's licenses of the occupants, checking for warrants in NCIC, and checking the vehicle through the Department of Motor Vehicles [*Id.* at 32].

Investigator Rogers did not recall whether any drugs were observed in plain view in the Jeep [*Id.*]. He said that prior to the drug dog's arrival, he did not know that the Jeep contained drugs, but he was investigating by conducting roadside interviews [*Id.* at 34]. Investigator Rogers said he had reasonable suspicion that the Jeep contained narcotics, which is why he called for the K-9 unit [*Id.*]. He said his reasonable suspicion was based on observing what he believed was a hand-to-hand transaction in the mall parking lot, the erratic driving through the parking lot, his interview of the driver of the truck, the interviews of the occupants of the Jeep, and information on the history of the Jeep [*Id.* at 34–35].

On cross-examination by Attorney Kurtz, Investigator Rogers agreed that he did not see drugs pass between the Jeep and the truck [*Id.* at 36]. He agreed the driver of the truck was Mr. Henkel [*Id.*]. He interviewed Mr. Henkel in the curve exiting the mall toward the main road [*Id.* at 37]. The interview was brief, lasting only five minutes [*Id.*]. He agreed that after he radioed information to Investigator Pope, he knew Investigator Pope would be conducting a traffic stop of the Jeep, and he wanted to get to that location as quickly as possible [*Id.* at 37–38]. Investigator Rogers agreed that he provided the information Investigator Pope knew about Mr. Henkel and included in his report[2] [Doc. 38–39]. He agreed he was the only officer who interviewed Mr. Henkel [*Id.* at 39]. He agreed that the gist of the information that he radioed to Investigator Pope from Mr. Henkel was that Henkel was in the mall parking lot to buy drugs and the occupants of the Jeep were armed [*Id.* at 40]. He also agreed that he had not interviewed Mr. Henkel or contacted

---

[2]    Defense counsel showed Investigator Rogers a report by Investigator Pope and asked him to review the narrative [Doc. 229 p. 38]. Although this report was pre-marked as Exhibit 109 by defense, it was not entered into evidence [*Id.* at 38–39].

him since that day [*Id.*]. He said that Mr. Henkel did not indicate a prior relationship with the occupants of the Jeep but stated that these were the people from whom he purchased narcotics [*Id.*].

Investigator Rogers agreed that Mr. Henkel did not tell him where the Jeep was going or provide any future information that he could confirm [*Id.* at 41]. He said when he radioed for officers to stop the Jeep, Investigator Pope responded that he could see the Jeep [*Id.* at 42]. He said knowing that the Jeep contained multiple occupants who were armed and that Investigator Pope was alone, he left Mr. Henkel [*Id.*]. Investigator Rogers said Mr. Henkel did not say he knew where the occupants of the Jeep lived or that he had been to their residence [*Id.*].

Investigator Rogers agreed that when it left the mall, the Jeep was traveling east on Interstate 40 ("I-40"), which is in the opposite direction of the apartments on Aldergate Way [*Id.* at 42–43]. The Jeep was stopped on the right shoulder of I-40 between the exit to West Town Mall and the Papermill Road exit [*Id.* at 43]. Investigator Rogers agreed that he parked in the "slow lane," not on the shoulder [*Id.*]. He acknowledged that several officers were on the scene at the start of the video recording from his body camera [*Id.*]. He agreed that upon arrival, he talked with the other officers on the scene to organize the safe extraction of the occupants from the Jeep [*Id.* at 44]. He agreed that he and the other officers were there before the video started and that the occupants of the Jeep had been detained for longer than is depicted on the video [*Id.* at 44–45].

Investigator Rogers said officers removed the two male occupants first, and then the two females [*Id.* at 45]. Once they were removed from the car, the occupants were handcuffed and remained handcuffed for the entire stop [*Id.* at 45–46]. He agreed that officers obtained the driver's licenses of the occupants [*Id.* at 46]. He stated that around 19:12:31, which is about seventeen minutes from the start of the video [Exh. 7], the license checks were complete and he was waiting

9

on the warrant checks [Doc. 229 pp. 46–47]. He acknowledged that he had no information that Defendant Scales's driver's license was invalid or that any of the occupants had outstanding warrants [*Id.*]. Investigator Rogers agreed that the occupants were not free to leave [*Id.* at 48].

Investigator Rogers said the K-9 unit performed a free air sniff of the Jeep [*Id.*]. He agreed that at 19:21:34 on the video recording, he was at the driver's side door of the Jeep, searching the center console [*Id.*]. He agreed that around 19:24:35 on the video, a set of keys with a black key fob bearing a white label or tape are visible on the driver's seat [*Id.* at 48–49]. He did not recall any markings on the key fob [*Id.* at 49].

Investigator Rogers did not know when drugs were seized from the Jeep [*Id.* at 50]. He agreed that on the second video recording [Exh. 8, 19:43:30], he said that the two female occupants had guns [Doc. 222 p. 50]. He agreed that approximately one hour into the stop, he made an exclamation when drugs were found [*Id.* at 51]. Investigator Rogers said between the initial stop of the Jeep and when the K-9 unit arrived, law enforcement continued their investigation while awaiting the drug dog [*Id.*]. He agreed that another officer held the occupants' identifications before he (Investigator Rogers) photographed them [*Id.*]. Investigator Rogers acknowledged that despite maintaining control of the occupants' identifications, that officer was not actively performing records checks but, instead, was talking to a female officer [*Id.* at 52].

On cross-examination by Attorney Cabage, Investigator Rogers testified that he did not recall if he advised the occupants of their *Miranda* rights [*Id.* at 53]. He said he did not search Defendant McDaniels so he did not know if drugs or cash were found on his person [*Id.*]. He did not remember if Defendant McDaniels was sitting in the front or the back of the Jeep, but he stated that one male and one female sat in the front while the other male and female sat in the back [*Id.*

at 54]. He agreed that the male sitting in the front was the driver, but he did not recall which male was the driver [*Id.*]

On cross-examination by Attorney Mathis, Investigator Rogers stated that he did not hear on the second video [Exh. 8] when the male occupant, who had been sitting in the back of the Jeep claimed the gun found in the back seat [*Id.* at 55]. He agreed in regard to the exchange in the mall parking lot, that he did not see drugs or cash passed through the window [*Id.*]. He agreed that the parties could have been having a conversation, although he saw a hand go from one vehicle to the other [*Id.* at 56]. He reiterated that he did not know when or in what order in relation to the other officers that he arrived at the stop of the Jeep, but he knew he acted as a "cover officer" providing coverage or security on the vehicle [*Id.*]. Investigator Rogers said the female wearing the yellow jacket was in the front of the Jeep, and the female wearing a pink jacket was seated in the back [*Id.*]. He was not aware of any weapons being found on Defendant Simmon's person [*Id.* at 57].

The defense called Lakenya Bowman, who testified that she works as the property manager at the Amberleigh Bluff Apartments for Steadfast Management Company [*Id.* at 59–60]. She said that Aldergate Way is a road in that apartment complex and that apartment 4107 at 9310 Aldergate Way is in that complex [*Id.* at 60]. Ms. Bowman is familiar with the keys for the apartment complex [*Id.*]. She identified a photograph [Exh. 1] as depicting generally the type of keys issued to residents of the apartment complex [Doc. 229 p. 61]. She said she could not identify from the key or the key fob to which apartment this key belongs [*Id.*]. Ms. Bowman also identified a second photograph of a key fob with keys [Exh. 106] as being the keys for an apartment at the complex [Doc. 229 p. 61–62]. She agreed that she provided the keys for that photograph and that one could not tell a particular apartment to which the keys belonged by looking at the keys [*Id.* at 62]. She agreed that Exhibit 107 depicted the same set of keys with the fob flipped over [*Id.*]. She stated

11

the keys have no identifying marks that would allow someone to know the apartment number connected to the keys [*Id.*].

On cross-examination, Ms. Bowman stated that the keys pictured in Exhibits 106 and 107 are keys to the Amberleigh Bluff Apartments [*Id.* at 63]. She said the white sticker on the back of the key fob contains information on the components of the fob and a series of numbers [*Id.* at 64]. She said the apartment staff do not write on the sticker, but she agreed that the residents could write on it to distinguish it from other keys [*Id.*]. She agreed that she was not at the apartment complex in November 2021, and she did not know if the residents of apartment 4107 wrote anything on their keys [*Id.*].

Upon hearing this evidence and the parties' arguments on the motion and receiving post-hearing briefs,[3] the undersigned took the matter under advisement.

## II.    FINDINGS OF FACT

Based upon the testimony of Investigator Rogers and Ms. Bowman, along with the exhibits, the undersigned makes the following factual findings.

On November 10, 2021, Investigator Evan Rogers and other officers in the KCSO Retail Crime Task Force were called to the West Town Mall on a report of shoplifting. While in the parking lot preparing to leave, Investigator Rogers noticed an older model Chevy pickup truck,

---

[3]    At the evidentiary hearing, Mr. Kurtz asked to file a post-hearing brief on the issue of whether the officers acted in good faith [Doc. 229 pp. 90–91]. The Court permitted post-hearing briefs on all issues but asked the parties to focus on the good-faith exception [*Id.* at 95]. It also allowed defense counsel to join in the post-hearing briefs by codefendants [*Id.* at 97]. Defendants Davis [Doc. 217], Scales [Doc. 218], and Simmon [Doc. 221] filed post-hearing briefs on September 20 and 21, 2022. Defendant Scales moved to join in Defendant Davis's brief [Doc. 219]. Defendant Davis moved to join in the brief filed by Defendant Scales [Doc. 220]. Defendant McDaniels moved to join in the briefs of Defendants Davis and Simmon [Doc. 223]. All motions to join in the briefs of codefendants [**Docs. 219, 220, & 223**] are **GRANTED,** and the undersigned will enter an order contemporaneously with this Report and Recommendation. The Government filed a responding post-hearing brief on October 4, 2022 [Doc. 230].

12

parked away from other vehicles. This vehicle caught his attention, and he began surveillance from two to three rows away. Within a few minutes, a newer model white Jeep arrived and parked beside the truck. Investigator Rogers saw the occupant of the truck reach his hand out of his vehicle and then draw his hand back into his truck. Immediately thereafter, both vehicles drove away recklessly and at a high rate of speed. Believing he had witnessed a hand-to-hand drug transaction, Investigator Rogers activated his lights and siren and pursued the truck to the other side of the mall, stopping it at the mall exit.

Investigator Rogers approached the truck and identified himself to the driver, Robert Henkel. Mr. Henkel told Investigator Rogers that he was at the mall to purchase narcotics from his dealer, who was in the white Jeep. Mr. Henkel said the Jeep contained several armed individuals and a lot of drugs. Mr. Henkel said he was supposed to follow the Jeep to another location to receive the drugs. Based on this information from Mr. Henkel, Investigator Rogers radioed for other officers to stop the Jeep, stating that the driver of the truck said the Jeep contained drugs and its occupants are armed. Investigator Don Pope responded that he could see the Jeep. Investigator Rogers left Mr. Henkel and drove to assist Investigator Pope, who was stopping the Jeep by himself.

Investigator Pope stopped the Jeep on the shoulder on the eastbound side of I-40 between the mall exit and the Papermill Road exit. Investigator Rogers arrived on the scene after the Jeep had been stopped but before the occupants were removed. He parked in the far-right lane to stop traffic in that lane. Several officers were on the scene at that time. Investigator Rogers provided security for officers who removed the occupants from the Jeep one at a time. The occupants were moved to the shoulder behind a police vehicle, frisked, and handcuffed. The video recording reveals that Defendant Scales was driving the Jeep, Defendant Davis was the front passenger, and

13

Defendants McDaniels and Simmon were in the backseat. After the four occupants were removed, officers asked for consent to search the Jeep, but consent was denied. Then, law enforcement called for a K-9 unit.

While awaiting the K-9 unit's arrival, officers performed records checks on the occupants' driver's licenses and identification cards and on the Jeep. Officers also checked NCIC for outstanding warrants. The K-9 unit arrived twenty-three minutes after Investigator Rogers started his body camera and at least twenty-five minutes after the stop of the Jeep. The drug detection dog alerted on the Jeep. Officers searched the Jeep and seized suspected heroin packaged in individual baggies, a package of marijuana, two firearms, currency, and four cellphones. While searching the Jeep, officers also discovered a black key fob with keys on the driver's seat. Defendant Davis's person was searched incident to her arrest, a bag of drugs was seized from the front of her pants.

Later, on November 10, 2021, KCSO Detective John Sharp obtained a search warrant for 9310 Aldergate Way, apartment number 4107.[4] Investigator Rogers participated in the execution of that search warrant, which also occurred on November 10, 2021. In the search of the apartment, officers seized suspected heroin, marijuana, a ledger, cash, digital scales, cellphones, and six firearms.

## III.    ANALYSIS

The Defendants challenge the warrantless stop and search of the Jeep and the subsequent search of the Aldergate Way apartment pursuant to a search warrant as violating their rights under the Fourth Amendment, which protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. All four Defendants argue that officers stopped the Jeep without reasonable

---

[4]     The application, affidavit of Detective Sharp, attachments, search warrant with attachments, and return with inventory are filed in the record [Doc. 138-1].

suspicion to conduct an investigatory stop[5] and that the length of the stop exceeded the time necessary to confirm or dispel their suspicions. Defendants Scales, Davis, and McDaniels argue that the affidavit in support of the search warrant for the Aldergate Way apartment lacks probable cause because it fails to establish the reliability and credibility of the cooperating source, does not provide a nexus between the apartment and alleged drug dealing, and relies upon stale information. They also contend that the affidavit recklessly or intentionally contains a false statement material to probable cause.

For the reasons set forth below, the undersigned finds officers properly stopped the Jeep based on reasonable suspicion of drug trafficking and reasonably detained its occupants while awaiting a drug detection dog. The undersigned also finds the affidavit in support of the search warrant for the Aldergate Way apartment fails to provide probable cause because it lacks a nexus between the apartment and drug trafficking and information that drugs are stored in the apartment is stale. The undersigned finds, however, that law enforcement searched the apartment in good faith reliance on the search warrant, and thus, the exclusionary rule should not be applied.

### A.    November 10, 2021 Stop of the Jeep

Law enforcement may temporarily seize a person or vehicle and, thus, conduct an investigatory or *Terry* stop, if the officer has "reasonable suspicion" of criminal activity stemming from "specific and articulable" facts which the officer knew at the time of the seizure. *Terry v. Ohio*, 392 U.S. 1, 21–22, 27 (1968); *United States v. Bentley*, 29 F.3d 1073, 1075 (6th Cir. 1994).

---

[5]    Defendants also argue that the officers lacked probable cause to stop the Jeep for a traffic violation [*See* Doc. 134 pp. 10–12]. At the evidentiary hearing, Investigator Rogers testified that the Jeep left the mall parking lot recklessly and at a high rate of speed. But the evidence did not reveal that Investigator Pope stopped the Jeep for a traffic violation. The undersigned therefore does not analyze whether there was probable cause to stop the Jeep for a traffic violation, but instead, analyzes Defendants' argument about the duration of the stop in the context of whether the officers had reasonable suspicion to conduct an investigatory stop of the Jeep.

15

Reasonable suspicion is a quantum of proof that is "considerably less" than a preponderance of the evidence. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). "Reasonable suspicion exists where the officer can articulate specific, particularized facts that amount to more than a 'hunch' that criminal activity may be afoot." *United States v. Bridges*, 626 F. App'x 620, 623 (6th Cir. 2015) (quoting *United States v. Jeter*, 721 F.3d 746, 751 (6th Cir. 2013)); *see also Terry*, 392 U.S. at 27 (holding that an investigatory stop must be based on more than the officer's "inchoate and unparticularized suspicion or 'hunch'").

The Court evaluates the presence of reasonable suspicion based upon the totality of circumstances at the time the officer decided to make the investigatory stop. *Bridges*, 626 F. App'x at 623. Officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Ellis*, 497 F.3d 606, 613 (6th Cir. 2007) (citation and quotation marks omitted). Additionally, the "collective knowledge doctrine" permits an officer to stop an individual based upon information from another officer. *United States v. Lyons*, 687 F.3d 754, 765–66 (6th Cir. 2012) ("Whether conveyed by police bulletin or dispatch, direct communication or indirect communication, the collective knowledge doctrine may apply whenever a responding officer executes a stop at the request of an officer who possesses the facts necessary to establish reasonable suspicion." (footnote and citations omitted)). A seizure, however brief, that lacks reasonable suspicion contravenes the Fourth Amendment. *United States v. Jones*, 562 F.3d 768, 773 (6th Cir. 2009).

### 1.    Standing

To successfully bring a Fourth Amendment claim, there must be a legitimate expectation of privacy in the place searched or the thing seized. *See Rakas v. Illinois*, 439 U.S. 128, 143 (1978)

16

("[The] capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place."). "[S]tanding is 'an element' of a Fourth Amendment suppression claim" and a "defendant bears the 'burden' of showing he [or she] has standing." *United States v. Russell*, 26 F.4th 371, 375 (6th Cir. 2022). The term "standing" has become "shorthand" for the requirement that a defendant must show that a search or seizure infringed upon his or her own rights. *Id.* at 374. Before turning to the substantive issues, the undersigned therefore briefly examines whether each of the four Defendants have standing to challenge the stop and search of the Jeep.

All four Defendants assert [Doc. 154 p. 2; Doc. 155 p. 3; Doc. 156 p. 3; Doc. 158 pp. 2–3] and the Government concedes [Doc. 170 p. 5] that all occupants of the vehicle have standing to challenge the constitutionality of the stop of the vehicle and whether duration of the stop was reasonable. *See Brendlin v. California*, 551 U.S. 249, 257, 263 (2007) (holding that a passenger is seized when an officer makes a traffic stop and may therefore challenge the constitutionality of the stop). The undersigned agrees.

The parties diverge, however, on whether they may challenge the search of the Jeep. Defendants all claim the ability to raise a Fourth Amendment issue as to the search of the vehicle because they may properly challenge the "'fruits of the unlawful detention'" [Doc. 154 p. 2; Doc. 155 p. 3; Doc. 156 p. 3; Doc. 158 p. 3 (quoting *United States v. Ellis*, 497 F.3d 606, 612 (6th Cir. 2007))]. The Government contends that only Defendant Scales, as the driver, has standing to challenge the search of the vehicle [Doc. 170 p. 5]. *United States v. Bah*, 794 F.3d 617, 626 (6th Cir. 2015).

"[A] passenger with no possessory interest in the . . . vehicle . . . does not have standing to directly contest the legality of the vehicle search on Fourth Amendment privacy grounds." *Id.* at

626 (footnote omitted); *see also Russell*, 26 F.4th at 377 (observing the passenger who neither owns, nor leases the vehicle, has neither a property nor a privacy interest in it). "[A] defendant has standing only if he has a Fourth Amendment interest in the property searched," which can "either be a property or a privacy interest." *Russell*, 26 F.4th at 377 (citation omitted). "Where the proponent of a motion to suppress is the car's driver but not the registered owner or lessee, mere possession of the car and its keys does not suffice to establish a legitimate possessory interest." *United States v. Taylor*, 496 F. Supp. 2d 852, 855–57 (S.D. Ohio 2006) (citations omitted). "Rather, the driver must demonstrate that he owned the vehicle or 'obtained possession from the owner of the vehicle or someone authorized by the owner to give him possession of the vehicle.'" *United States v. Smith*, No. 3:19-CR-22-KAC-DCP, 2022 WL 14742777, at *7 (E.D. Tenn. Sept. 16, 2022) (quoting *Taylor*, 496 F. Supp. 2d at 856).

Here, none of the Jeep's occupants claimed to have owned or rented the Jeep. Even Defendant Scales, who was driving the Jeep at the time it was stopped, does not contend that he is the owner or renter of the vehicle, nor does he assert that the vehicle's owner authorized his possession of the Jeep. Instead, all the Defendants rely on *United States v. Ellis*, and assert that they can challenge the search of the Jeep because the evidence seized from it flows from their unlawful detention. 497 F.3d 606, 612 (6th Cir. 2007). In *Ellis*, the Court found that while the passenger could not challenge the owner's consent to search the vehicle, the passenger had "standing to challenge his alleged unlawful seizure and the evidence that flowed from the search and seizure[.]" *Id.* at 612, 614 (declining to suppress cocaine seized from the vehicle searched because the "lawful traffic stop did not evolve into an unconstitutional seizure" and, thus, the cocaine "did not flow from a Fourth Amendment violation"); *see also United States v. Torres-Ramos*, 536 F.3d 542, 549 (6th Cir. 2008) (holding passengers lacked standing to object to search

of van but could still challenge their stop and detention and seek suppression of the fruit of their illegal seizure); *accord United States v. Dukins*, No. 1:11–cr–34, 2011 WL 7396411, at \*5 (E.D. Tenn. Dec. 19, 2011) (permitting passenger to challenge evidence seized from alleged prolonged detention and after dog alert), *report and recommendation adopted by* 2012 WL 529583 (E.D. Tenn. Feb. 17, 2012); *United States v. Jimenez*, No. 1:08-cr-101, 2009 WL 2905933, at \*10 (E.D. Tenn. Sept. 2, 2009) (concluding that passenger had "standing to challenge the legality of his detention and have evidence arising out of an illegal detention suppressed as fruit of the poisonous tree"), *aff'd*, 446 F. App'x 771 (6th Cir. 2011).

Upon review of Defendants' argument and applicable case law, the undersigned finds that despite the absence of any established possessory or privacy interest in the Jeep, the Defendants have standing to challenge the reasonable suspicion for the stop and the scope and duration of their detention and to argue that the evidence flowing from their unlawful detention should be suppressed.

### 2. Reasonable Suspicion

"An officer can lawfully stop a vehicle if she has reasonable suspicion of an ongoing crime." *United States v. Chandler*, No. 22-1143, 2022 WL 17336092, at \*3 (6th Cir. Nov. 30, 2022) (citing *United States v. Collazo*, 818 F.3d 247, 253–54 (6th Cir. 2016)); *see also United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008) ("Under *Terry*, police may stop a vehicle based on reasonable suspicion of an ongoing crime." (citations omitted)). Here, the undersigned finds that Investigator Rogers had reasonable suspicion that the Jeep would contain evidence of drug trafficking.

Investigator Rogers observed what he believed was a hand-to-hand drug transaction in the mall parking lot between the occupants of the Jeep and a pickup truck. He had been surveilling the

truck which was parked away from other vehicles while the driver remained in the car for an extended time. He saw the Jeep park beside the truck, a hand reach from the truck to the Jeep and then return to the truck, and then both vehicles immediately drive away at a high rate of speed.

Investigator Rogers pursued and stopped the truck on the other side of the mall, while another officer followed the Jeep. The driver of the truck, who identified himself as Robert Henkel, told Investigator Rogers that he was in the mall parking lot to buy narcotics from the people in the Jeep and that he was to follow the Jeep to another location to get the drugs. Henkel also stated that the Jeep contained multiple people, that they were armed, and that they had a large quantity of drugs in the Jeep. Investigator Rogers immediately radioed for other officers to stop the Jeep relaying that it contained multiple armed individuals and drugs. The undersigned finds that at this point, Investigator Rogers had reasonable suspicion to believe the Jeep contained evidence of drug trafficking based on his own observation of the transaction between the two vehicles and the information from Mr. Henkel that the occupants of the Jeep were dealing drugs out of the Jeep. The undersigned also finds that Investigator Pope properly stopped the Jeep at Investigator Rogers's direction, pursuant to the collective knowledge doctrine. *See Lyons*, 687 F.3d at 765–66 (discussing the collective knowledge doctrine).

Defendants characterize Investigator Rogers's suspicions about the Jeep and its occupants as a mere hunch because the interaction between the two vehicles could have been innocent and Investigator Rogers did not see any drugs or money in the alleged hand-to-hand transaction [Doc. 134 ¶ 7; Doc. 221 p. 3; Doc. 217 p. 2]. During cross-examination, Investigator Rogers agreed that the interaction between the occupants of the Jeep and the truck could have been a conversation but he stated that he saw the driver of the truck reach into the Jeep [Doc. 229 pp. 55–56]. He also saw the two vehicles drive away recklessly and at high speed immediately after this action [*Id.* at

20

12]. Investigator Rogers testified that based upon his training, education, and experience with drug investigations, he thought he had witnessed a hand-to-hand drug transaction [*Id.* at 12–13]. *See United States v. Alexander*, 528 F. App'x 515, 519 (6th Cir. 2013) ("Hand-to-hand transactions consistent with drug transactions are 'highly probative' in evaluating reasonable suspicion."); *United States v. Jones*, 673 F.3d 497, 502 (6th Cir. 2012) (affirming reasonable suspicion of drug trafficking based upon officer witnessing hand-to-hand drug transaction in high crime area and defendant fleeing on foot upon noticing police). In developing reasonable suspicion, officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Arivizu*, 534 U.S. 266, 750–51 (2002); *Alexander*, 528 F. App'x at 519 ("Although [the court] must apply an objective reasonableness standard when determining whether the officers had a reasonable suspicion of ongoing criminal activity, we must give due weight to their factual inferences in deference to their specialized training." (citation omitted)).

The Defendants also challenge the information from Mr. Henkel as unreliable and uncorroborated [Doc. 134 pp. 7–10]. They point out that Mr. Henkel, who admitted to attempting to purchase drugs, did not provide any predictive information about the Jeep or its occupants that the officers could corroborate [*Id.* at 9–10]. Nor did the officers see any drugs or guns in plain view in the Jeep following the stop. [*Id.* at 10].

The weight to be attributed to information from an informant exists on a continuum, with information from known informants being generally entitled to more weight than anonymous informants and predictive or future tips carrying more weight than tips which cannot be corroborated. *United States v. Williams*, 483 F. App'x 21, 25–26 (6th Cir. 2012) (evaluating the presence of reasonable suspicion must be done on a "case-by-case basis"). Known informants

providing information in person are generally deemed more reliable than anonymous and remote tipsters because the officer can "observe the informant's demeanor and credibility" and can hold the informant accountable if he or she provides false information. *Id.* at 26 (cleaned up and citation omitted).

Here, Mr. Henkel was a known informant providing information in person. Investigator Rogers had the opportunity to observe Mr. Henkel's demeanor and mannerisms. Additionally, if the information from Mr. Henkel proved to be false, he could be prosecuted.[6] *Williams*, 483 F. App'x at 26 ("Because police had the informant handcuffed in the back of the patrol car—albeit temporarily—the informant faced a real risk of repercussions if the information he provided proved false."); *United States v. May*, 399 F.3d 817, 824–25 (6th Cir. 2005) (holding that a report from an informant whose identity is known to law enforcement, thus, subjecting the informant to prosecution for making a false report, is "entitled to far greater weight than . . . an anonymous source"); *see also Chandler*, 2022 WL 17336092, at *3 (finding a telephone tip from an individual who gave his name and provided details about the travel dates and locations for a member of the drug trafficking conspiracy contributed to reasonable suspicion to stop the vehicle with the suspected drugs).

Defendants argue that Henkel did not indicate that he had prior knowledge of or contact with the occupants in the Jeep, and he provided no predictive information about the occupants to allow law enforcement to corroborate his account [Doc. 229 p. 83]. The undersigned finds,

---

[6]     Although Investigator Rogers testified that he "cut [Mr. Henkel] lo[o]se" due to his concern for Investigator Pope, the Court finds another officer was parked behind Investigator Rogers while he talked with Mr. Henkel and available to take over the investigation [*See* Doc. 229 pp. 14–16]. The Court notes Investigator Pope's Incident Report regarding the November 10, 2023 stop, which was identified at the evidentiary hearing as Exhibit 109 but not formally moved into evidence, lists Robert Henkel as a suspect and witness and contains his photograph and address.

however, that Mr. Henkel told Investigator Rogers that his dealer was in the Jeep, which suggests a prior relationship. Moreover, Mr. Henkel's "recent and close proximity to the [Jeep] supports at least an inference that the information provided *was* based on personal knowledge." *Williams*, 483 F. App'x at 26. "Tips that provide specific details or predictions of future action fall higher on the reliability scale because they suggest the existence of knowledge to which the public might not have access." *Id.* at 25 (citing *Alabama v. White*, 496 U.S. 325, 332 (1990)). Mr. Henkel told Investigator Rogers that he was following the Jeep to another location to receive the drugs and that the Jeep contained a lot of drugs. The undersigned agrees this information was not predicting a future action, at least not one the officers could corroborate because Henkel did not provide the other location. Even without a predictive aspect, however, the undersigned finds Henkel's information contributed to Investigator Roger's reasonable suspicion that the Jeep contained evidence of drug trafficking. *See Williams*, 483 F. App'x at 25–26 (concluding that information from unnamed but identifiable informant, who, while handcuffed and detained in the back of a patrol car, stated he saw a gun in a blue Cadillac, contributed to officer's reasonable suspicion to stop the Cadillac).

### 3. Length of Stop

A stop "which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope." *Terry*, 392 U.S. at 18. Once a court determines that a seizure was proper, it must still assess "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 20. A lawful stop can nevertheless "violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). In evaluating the duration of an investigatory stop, the Court examines "whether the detention was (1) sufficiently limited in time

and (2) involved the least intrusive means that were reasonably available." *United States v. Mendoza-Ricardo*, 815 F. App'x 970, 976 (6th Cir. 2020) (citing *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005)). Thus, law enforcement must have "'diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.'" *Id.* (quoting *United States v. Sharpe*, 470 U.S. 675, 686 (1985)). The Court should not second guess the investigatory techniques employed but, instead, must determine whether law enforcement acted reasonably. *Sharpe*, 470 U.S. at 686–87. The undersigned therefore examines whether the investigatory stop in this case was reasonable in duration and whether the means of investigation were "'minimally intrusive.'" *Davis*, 430 F.3d at 355 (quoting *United States v. Place*, 462 U.S. 696, 706 (1983)).

After stopping the Jeep, law enforcement detained the Defendants for at least twenty-five minutes until the K-9 unit arrived. During this period, the officers removed each of the Defendants from the vehicle, frisked them, and handcuffed them. They obtained the Defendants' driver's licenses and identification cards. They ran records checks on the four licenses and identification cards. They checked the Jeep in the Department of Motor Vehicles records, and they checked the NCIC database for outstanding warrants on the Defendants. Investigator Rogers also took photographs of the identification cards and driver's licenses.

Defendants argue that the detention was unreasonable because they were frisked and handcuffed on the side of the road and the officers on the scene did not diligently pursue the investigation [Doc. 217 p. 4; Doc. 221 p. 4; Doc. 229 p. 91]. *See United States v. Whitley*, 34 F.4th 522, 527 (6th Cir. 2022) ("The reasonableness of a seizure . . . depends on what the police in fact do." (internal quotation omitted)). Specifically, Defendants argue that, instead of expeditiously conducting records checks, officers milled around on the scene waiting for the K-9 unit to arrive

[Doc. 217 p. 4; Doc. 229 p. 84]. They also assert that no reasonable suspicion was developed prior to the K-9's arrival [Doc. 229 p. 93].

"[T]he use of a well-trained drug-sniffing dog that was brought to the scene within a reasonable period after the initial . . . stop [is] a permissible means of determining whether the police were correct to suspect that [an occupant of the vehicle] was in possession of narcotics." *Id.* Courts have found investigatory detentions of up to forty-five minutes to allow a drug dog to arrive on the scene of a vehicle stop to be reasonable. *Davis*, 430 F.3d at 355 (2005) (thirty-to forty-five-minute *Terry* detention "to locate and procure[]" a drug detection dog was reasonable); *see United States v. Coker*, 648 F. App'x 541, 546 (6th Cir. 2016) (observing no issues with lapse of "thirty-nine minutes from the initial stop to the drug dog alert"); *United States v. Garcia*, 496 F.3d 495, 504 (6th Cir. 2007) (finding duration of stop was reasonable when officers suspected vehicle's occupants of drug trafficking and dog sniff was conducted within one-half hour of the stop); *United States v. Orsolini*, 300 F.3d 724, 730 (6th Cir. 2002) (concluding length of *Terry* detention was reasonable when officers spent "approximately 35 minutes . . . waiting for a dog unit to arrive[,]" and "[t]he entire investigation thus lasted for less than one hour"); *see also United States v. Hargis*, No. 5: 21-075-DCR, 2021 WL 5237966, at *4 (E.D. Ky Nov. 8, 2021) (finding both the length of the investigatory detention—fifteen minutes—and the means of investigation—a dog sniff—were reasonable to confirm or dispel the officer's suspicions that defendant was engaged in a drug transaction). Based upon this precedent, the undersigned finds that the length of detention here was reasonable and the means of investigation was minimally intrusive.[7]

---

[7] Because the Court has found the length of the detention while awaiting the K-9 unit to be reasonable, whether all the officers on the scene were actively investigating is immaterial.

25

Additionally, the undersigned finds the removal, frisk, and handcuffing of Defendants were reasonable. The officers had information that the occupants of the Jeep were armed, so the officers could remove the Defendants from the vehicle for officer safety. *See Rodrigues v. United States*, 575 U.S. 348, 356 (2015) ("Traffic stops are 'especially fraught with danger to police officers,' . . . so an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely"(internal citation omitted)); *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977) (requiring the driver to exit the car during a vehicle stop is a *di minimis* intrusion). Specifically, the officers had the information from Mr. Henkel that the Jeep's occupants were armed. This constituted a specific, articulable reason justifying the frisk. *Coker*, 648 F. App'x at 545 (explaining that to justify a frisk, an officer must have reasonable suspicion that the individual is "armed and dangerous" (quoting *Arizona v. Johnson*, 555 U.S. 323, 327 (2009))); *see also United States v. Noble*, 762 F.3d 509, 523 (6th Cir. 2014) (explaining that "an officer must have specific, articulable reasons to believe that a particular person is armed and dangerous before the officer may frisk a suspect" but that "a person's mere presence in a car, which the police believe is connected to drug trafficking, is not an automatic green light for frisking that person"). Finally, Investigator Pope, Investigator Rogers, and the other officers initially on the scene believed Defendants to be armed and engaged in a drug transaction, making the handcuffing of Defendants necessary for the officers' safety. *See Valdez v. United States*, 58 F. Supp. 3d 795, 817 (E.D. Mich. 2014) ("'Officers are authorized to handcuff individuals during the course of investigative detentions if doing so is reasonably necessary to protect their personal safety or maintain the status quo.'" (quoting *Lundstrom v. Romero*, 616 F.3d 1108, 1122 (10th Cir. 2010))); *see also United States v. Slaughter*, 751 F. App'x 659, 662 (6th Cir. 2018) ("[D]uring *Terry* stops concerning narcotics transactions, officers are entitled—without probable cause—to remove suspects from a

vehicle and place them in handcuffs as a precaution." (citation omitted)); *see also Hargis*, 2021 WL 5237966, *4 (handcuffing individuals suspected of drug trafficking for officer safety upon their removal from a vehicle during an investigatory stop did not "ripen the detention into an arrest").

In summary, the undersigned finds that law enforcement properly stopped the Jeep containing the Defendant's because they had reasonable suspicion that it contained illegal drugs. The undersigned also finds that the investigatory detention was reasonable in duration and scope.[8] Accordingly, the undersigned recommends that the District Judge deny Defendants' Motion to Suppress Evidence Seized as the Result of a Traffic Stop [Doc. 134].

### B. November 11, 2021 Search of Aldergate Way Apartment

In the early morning of November 11, 2021, law enforcement searched apartment 4107 on Aldergate Way in Knoxville, Tennessee ("the apartment"), pursuant to a search warrant issued at 11:58 p.m., on the preceding day [Doc. 138-1 p. 14]. Defendant Scales asks the Court to suppress all evidence seized from the search of the apartment because the affidavit in support of the search warrant fails to provide probable cause for its issuance [Doc. 132 p. 1]. He identifies four deficiencies with the affidavit: (1) it fails to show the cooperating source ("CS") is reliable; (2) it does not establish a nexus between the apartment and the alleged criminal conduct; (3) the

---

[8]     Defendants do not challenge the search of the Jeep based upon the positive alert by the drug detection dog, nor the search of Defendant Davis incident to arrest after the search of the Jeep. Nevertheless, law enforcement had probable cause to search the Jeep based upon the positive alert by the drug detection dog, *United States v. Kelley*, 459 F. App'x 527, 532 (6th Cir. 2012) ("[I]t is well settled that an alert from a trained dog provides probable cause for a search for drugs), and following the seizure of illegal drugs and firearms from the Jeep, Defendant Davis was properly searched incident to arrest, *United States v. Bradshaw*, 102 F.3d 204, 213 (6th Cir. 1996) ("It is well-settled that law enforcement officers are permitted to search an arrestee's person incident to an arrest.").

27

information is stale; and (4) a material, false statement was deliberately or recklessly included in the affidavit. Defendant Davis joins in this motion [Doc. 133].[9]

In order to satisfy the requirements of the Fourth Amendment, a search warrant must be based on an affidavit containing "particularized facts" that demonstrate "'a fair probability that evidence of a crime will be located on the premises of the proposed search.'" *United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006) (quoting *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005)). Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983). "[P]robable cause is a flexible, common[-]sense standard," causing a person "of reasonable caution" to believe that the items are evidence of a crime. *Texas v. Brown*, 460 U.S. 730, 742 (1983). In other words, probable cause is "reasonable grounds for belief[] supported by less than prima facie proof but more than mere suspicion." *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990). Whether probable cause to issue a search warrant exists is evaluated by looking at the totality of the circumstances related in the affidavit. *Gates*, 462 U.S. at 238.

An issuing judge's determination that probable cause exists is entitled to "'great deference.'" *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (quoting *Gates*, 462 U.S. at

---

[9] Defendant McDaniels also moves to join in the motion to suppress evidence seized from the apartment [Doc. 136]. In his brief on standing, Defendant McDaniels asserts that he was an overnight guest at the apartment [Doc. 154 p. 1]. At the evidentiary hearing, however, defense counsel stated that he was not introducing evidence that Defendant McDaniels was an overnight guest at the apartment [Doc. 229 p. 92]. He explained that if the evidence seized from the apartment is suppressed as to Defendants Davis and Scales, his status as an overnight guest would not matter [*Id.*]. Following the evidentiary hearing, Defendant McDaniels moved to adopt the post-hearing briefs of Defendants Davis and Simmons on the motion to suppress evidence seized from the stop of the Jeep, but he did not seek to join Defendant Scales's post-hearing brief relating to the motion to suppress evidence seized from the apartment [*See* Doc. 223 p. 1]. The Court takes defense counsel's statements at the evidentiary hearing as a withdrawal of his motion to join in the motion to suppress evidence seized from the apartment.

28

236). This deferential standard promotes the preference for the use of search warrants as opposed to warrantless searches. *Id.* "The task of the issuing [judge] is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. The "duty of a reviewing court is simply to ensure that the [judge] had a substantial basis for concluding that probable cause existed." *Id.* at 238–39. In reviewing the sufficiency of probable cause for a search warrant, the Court considers only the information that was before the issuing judge, i.e., the information contained within the four corners of the supporting affidavit. *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010).

### 1. Standing

The undersigned examines whether Defendants Scales and Davis have standing to challenge the search of the apartment, i.e., whether the search infringed upon the Defendant's personal rights or legitimate expectation of privacy in the apartment. *Russell*, 26 F.4th at 375; *United States v. Talley*, 275 F.3d 560, 563 (6th Cir. 2001) (holding a defendant challenging a search has the burden of demonstrating his or her legitimate expectation of privacy in the location). In assessing the reasonableness of a defendant's expectation of privacy, the Court examines

> the person's proprietary or possessory interest in the place to be searched or item to be seized; whether the defendant has the right to exclude others from the place in question; whether he had taken normal precautions to maintain his privacy; whether he has exhibited a subjective expectation that the area would remain free from governmental intrusion; and whether he was legitimately on the premises.

*United States v. Waller*, 426 F.3d 838, 844 (6th Cir. 2005) (cleaned up) (quoting *United States v. King*, 227 F.3d 732, 744 (6th Cir. 2000)).

29

An overnight social guest "has a reasonable expectation of privacy in the place where he sleeps at night." *United States v. Allen*, 720 F. App'x 254, 257 (6th Cir. 2018) (citing *Minnesota v. Oleson*, 495 U.S. 91, 96-97 (1990)). In determining whether an overnight guest has a legitimate expectation of privacy in the host's home, the Court examines a relationship with the homeowner or lessee and other indicia of "acceptance into the household," such as having a key. *United States v. Heath*, 259 F.3d 522, 532–33 (6th Cir. 2001) (internal quotation omitted).

Defendant Scales proffers that he had lived at the apartment since February 2021 [Doc. 158 p. 4]. He contends that he had a key to the apartment, which was seized from the Jeep on November 10, 2021 [*Id.*]. Defendant Scales asserts that he paid rent; he shared a bedroom with Defendant Davis, with whom he was in an intimate relationship; and he had personal belongings in closet, bathroom, and other areas [*Id.*].

Defendant Davis proffers that she is on the lease for the apartment [Doc. 155 p. 4]. She contends that even if she were not a lessee, she has a legitimate expectation of privacy in the apartment because she had free access to the property and possessed a key, which was taken from her during the stop of the Jeep [*Id.* at 5].

The Government agrees that both Defendants Scales and Davis had a possessory interest in the apartment and standing to challenge the search [Doc. 170 p. 10].

The undersigned finds that both Defendants Scales and Davis have standing to challenge the search of the apartment. Defendant Davis's claim that the apartment was her residence is supported by the apartment's address appearing on her driver's license, which was photographed during the stop of the Jeep [Exh. 5]. While Defendant Scales's driver's license has a Michigan address [*Id.*], the undersigned finds that he is at least an overnight guest and possessed a key to the apartment, stored belongings there, and was in an intimate relationship with Defendant Davis. As

such, Defendant Scales was accepted into the household and has a legitimate expectation of privacy in the apartment.

## 2. Reliability of Confidential Informant

If probable cause to issue a search warrant is gained from information provided by a confidential source, then the issuing judge must have a basis for finding that the source is reliable or credible and was in a position to know the information provided. *United States v. Dyer*, 580 F.3d 386, 390 (6th Cir. 2009). An informant's veracity or reliability and basis of knowledge are not rigid categories but, instead, factors in the totality of the circumstances considered by the court. *Gates*, 462 U.S. at 238–39 (rejecting the two-prong *Agular-Spinelli* test in favor of the flexible totality of the circumstances test, which "include[es] the 'veracity' and 'basis of knowledge' of persons supplying hearsay information"); *United States v. Johnson*, 514 F. App'x 533, 539 (6th Cir. 2013).

Independent police corroboration can also help shore up any deficiencies in reliability or basis of knowledge. *Gates*, 462 U.S. at 242; *Johnson*, 514 F. App'x at 539. "'While independent corroboration of a confidential informant's story is not a sine qua non to a finding of probable cause, in the absence of any indicia of the informant['s] reliability, courts insist that the affidavit contain substantial independent police corroboration.'" *Id.* (quoting *United States v. Frazier*, 423 F.3d 526, 532 (6th Cir. 2005) (further quotation omitted)); *see also United States v. Tuttle*, 200 F.3d 892, 894 (6th Cir. 2000) ("[I]nformation received from an informant whose reliability is not established may be sufficient to create probable cause when there is some independent corroboration by the police of the informant's information." (citations omitted)).

Detective Sharp's affidavit relies on information from a confidential source, who is stated to be in an intimate relationship with Martez Wilson, the alleged leader of the drug trafficking

31

organization ("DTO") under investigation [Doc. 138-1 pp. 3–4]. The CS states that Wilson, Scales, Davis, and others are involved in transporting "significant quantities of heroin and bulk cash" between Knoxville, Tennessee, and Detroit, Michigan [*Id.* at 4]. According to the CS, when in Knoxville, Wilson, Scales, and Davis store illegal drugs and cash in an apartment, where Davis and Scales live, and which is rented by "Emily" [*Id.*]. Also, the CS provided law enforcement with a photograph of Emily [*Id.*]. The affidavit relates that using public sources, law enforcement corroborated that Emily Long is "the renter and/or resident" of apartment 4107 at 9310 Aldergate Way [*Id.*].

The Court agrees that the affidavit is devoid of information on the CS's reliability or credibility [Doc. 132 pp. 3–4]. The affidavit does not state that the CS is known to law enforcement or provided reliable information to law enforcement in the past. It contains no information on the CS's motivation for providing the information, and other than the statement that the apartment is rented by "Emily," the information is general rather than specific. Finally, the only information suggesting the CS's basis of knowledge is that CS is in an intimate relationship with Wilson. The affidavit does not state whether CS personally observed any of the information provided, other than the photograph.

Defendants argue that the only portion of the CS's information that is corroborated by law enforcement is that Emily rents the apartment [Doc. 132 p. 4; Doc. 177 pp. 4–5]. They contend that confirmation of this innocent detail falls well short of the "substantial independent police corroboration" necessary when other indicia of reliability are absent. *See Johnson*, 514 F. App'x at 539; *see also United States v. Higgins*, 557 F.3d 381, 390 (6th Cir. 2009) ("The affidavit contains no assertion that this informant is known to be reliable, nor did the police corroborate any of the informant's statements beyond the innocent fact that [defendant] lived at the stated location and

the irrelevant (to the determination of whether [defendant's] house contained evidence of a present-day crime) fact that [defendant] had a criminal record."); *overruled on other gnds as recognized by Brown v. United States*, No. 21-6131, 2022 WL 18832160, at *2 (6th Cir. Sept. 15, 2022) (addressing sentencing enhancement), *cert. denied*, ___ S. Ct. ___, No. 22-6839, 2023 WL 2744997 (Apr. 3, 2023); *United States v. Leake*, 998 F.2d 1359, 1365 (6th Cir. 1993) (determining affidavit lacked probable cause when based on information from a confidential informant that was not detailed and contained no predictive information and police corroborated only that the residence had a basement).

The Government counters that the information from Henkel that he was purchasing heroin from the occupants of the Jeep, which was subsequently searched and contained Defendants Davis and Scales and a quantity of heroin, corroborates the information from the CS that Scales and Davis were involved in a DTO in Knoxville [Doc. 170 p. 9]. The Court agrees that this information corroborates the CS's allegation that Defendants Scales and Davis were involved in the DTO. But given the general nature of this allegation that Defendants were involved in the DTO with no details on how or when that law enforcement could corroborate, the Court questions whether the threshold of "substantial corroboration" has been met.

### 3.     Nexus

"To justify a search, the circumstances must indicate why evidence of illegal activity will be found 'in a particular place.'" *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc). In other words, probable cause requires a "'nexus between the place to be searched and the evidence sought.'" *Id.* (quoting *United States v. Van Shutters*, 163 F.3d 331, 336–37 (6th Cir. 1998)). "The connection between the residence and the evidence of criminal activity must be specific and concrete, not 'vague' or 'generalized.'" *United States v. Brown*, 828 F.3d 375, 382

(6th Cir. 2016) (quoting *Carpenter*, 360 F.3d at 595). Assessing whether an affidavit establishes a nexus turns upon the facts of a particular case and requires examination of the totality of the circumstances. *Id.* The Court must determine "'whether the [issuing judge] had a substantial basis for finding that the affidavit established probable cause to believe that the evidence would be found at the place cited.'" *United States v. Merriweather*, 728 F. App'x 498, 504 (6th Cir. 2018) (quoting *United States v. Davidson*, 936 F.2d 856, 859 (6th Cir. 1991)).

Here, the nexus between the apartment and criminal activity comes down to a single statement by the CS that Davis and Scales store illegal drugs, such as heroin, and cash in the apartment where Davis and Scales live [Doc. 138-1 p. 4], and the affiant's experience that drug traffickers store contraband and proceeds in their residences [*Id.* at 6]. Yet, in this circuit, a person's status as a drug trafficker alone is insufficient to provide a nexus to search their home. *United States v. Sanders*, 59 F.4th 232, 239 (6th Cir. 2023) ("This Court has 'never held . . . that a suspect's status as a drug dealer, standing alone, gives rise to a fair probability that drugs will be found in his home.'" (quoting *United States v. Brown*, 828 F.3d 375, 383 (6th Cir. 2016) and collecting cases). In addition to showing that the defendant was trafficking drugs and lived at the residence, the affidavit must provide "additional specific 'evidence showing a connection between [the] alleged drug trafficking and the' residence . . . ." *Id.* at 240 (quoting *United States v. Sumlin*, 956 F.3d 879, 887 (6th Cir. 2020)). "[I]f the affidavit fails to include facts that directly connect the residence with the suspected drug dealing activity, or the evidence of this connection is unreliable, it cannot be inferred that drugs will be found in the defendant's home—even if the defendant is a known drug dealer." *Brown*, 828 F.3d at 384. While Sixth Circuit caselaw remains "unsettled" as to the amount of additional evidence of drug activity necessary for a nexus, "[a]t a minimum, [courts] have required 'facts showing that the residence has been used in drug trafficking, such as

34

an informant who observed drug deals or drug paraphernalia in or around the residence.'" *United States v. Grant*, No. 21-3686, 2023 WL 119399, at *3 (6th Cir. Jan. 6, 2023) (quoting *Brown*, 828 F.3d at 383); *see also Sanders*, 59 F.4th at 240 (discussing *Grant*).

Upon review, the affidavit lacks any evidence that the CS or anyone observed drug transactions at the apartment. At the evidentiary hearing, the Government argued that the hand-to-hand exchange occurred only four miles from the Defendants' apartment [Doc. 229 p. 76]. But cases relying on nearby drug transactions beyond the immediate environs of the residence emphasize a "direct line" of travel from the residence to the site of the drug transaction as established by police surveillance. *United States v. Miller*, 850 F. App'x 370, 374 (6th Cir. 2021); *see also United States v. Houser*, 752 F. App'x 223, 225–26 (6th Cir. 2018) (finding nexus when the defendant engaged in drug transaction on the side of his apartment building then returned directly to his apartment); *United States v. Berry*, 565 F.3d 332, 339 (6th Cir. 2009) (finding nexus based upon the defendant's status as a drug dealer plus seizure of drugs from car in driveway). Neither a direct nor indirect line of travel exists here. Nor does the affidavit state that the CS observed controlled substances at the apartment; the affidavit is silent on the CS's basis of knowledge. Finally, despite the affidavit's allegation that law enforcement had investigated the DTO for eighteen months, the affidavit does not allege ongoing drug trafficking by the DTO. *See United States v. McCoy*, 905 F.3d 409, 418 (6th Cir. 2018) ("Under this continual-and-ongoing-operations theory, we have at times found a nexus between a defendant's residence and illegal drug activity with no facts indicating that the defendant was dealing drugs from his residence."). The only drug transaction related is the thwarted hand-to-hand transaction in the mall parking lot [Doc. 138-1 pp. 3–4]. Thus, the Court finds that the affidavit fails to provide a nexus between the apartment and drug trafficking.

### 4. Staleness

A "warrant is stale if the probable cause, while sufficient at some point in the past, is now insufficient as to evidence at a specific location." *United States v. Abboud*, 438 F.3d 554, 572 (6th Cir. 2006) (internal quotations omitted). The nature of the crime affects the staleness assessment, with evidence of drug trafficking quickly becoming stale because "drugs are usually sold and consumed in a prompt fashion." *United States v. Frechette*, 583 F.3d 374, 378 (6th Cir. 2009). Four factors inform the Court's staleness analysis:

> (1) the character of the crime (chance encounter in the night or regenerating conspiracy?),
>
> (2) the criminal (nomadic or entrenched?),
>
> (3) the thing to be seized (perishable and easily transferrable or of enduring utility to its holder?), and
>
> (4) the place to be searched (mere criminal forum of convenience or secure operational base?).

*Id.* (quoting *Abboud*, 438 F.3d at 572–73). Application of these factors in this case reveals that the information in the affidavit was stale.

Defendants argue that law enforcement obtained the information from the CS one month before the issuance of the search warrant [Doc. 132 p. 8]. They assert that the affidavit does not state when (or how) the CS learned of their alleged involvement in transporting controlled substances between Knoxville and Detroit or the alleged storage of controlled substances in the apartment [*Id.*]. They contend that the affidavit is silent on whether or when the CS was at the apartment [*Id.*]. According to Defendants, the vague information from the CS is at least thirty days old and does not permit the issuing judge to determine that evidence of drug trafficking was presently at the apartment [*Id.*]

The affidavit alleges that Defendants are involved in ongoing drug trafficking between Knoxville and Detroit, *see United States v. Greene*, 250 F.3d 471, 481 (6th Cir. 2001) ("Evidence of ongoing criminal activity will generally defeat a claim of staleness."), but the Court agrees with Defendants that the affidavit does not indicate when that activity began, *see id.* (explaining that the significance of the passage of time diminishes if the alleged crime occurred in a "secure operational base" (internal quotation omitted)). Although the affidavit alleges that Defendants Scales and Davis live at the apartment, it also indicates they spend part of their time in Detroit, which suggests a nomadic lifestyle. Moreover, no drug transactions are linked to the apartment, and it is impossible to know when drugs were last allegedly stored there. As stated above, drugs by their nature are easily transferrable and quickly sold and consumed.

The affidavit also related recent information (the November 10 hand-to-hand transaction in the mall parking lot and the seizure of heroin from the Jeep and Davis's person that same day), *see United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998) ("[E]ven assuming the information in the affidavit was in some respects 'stale,' the more recent events related therein refreshed this otherwise stale information."), but that information was not linked to the apartment. In *United States v. Pointer*, recent information involving the defendants going back and forth to and parking at an apartment that was not their residence refreshed the accounts of controlled buys from the previous year, some of which involved trips to and from the apartment before drug transactions. No. 22-1082, 2022 WL 17820539, at *7 (6th Cir. Dec. 20, 2022) ("'Where recent information corroborates otherwise stale information, probable cause may be found.'" (quoting *United States v. Henson*, 848 F.2d 1374, 1381–82 (6th Cir. 1988))). Accordingly, the court rejected the staleness argument: "Even if some of the evidence cited by the warrant affidavit was remote in time, all of the evidence, considered together, paints a clear picture of an ongoing drug operation using the

Woodruff Apartment as a base." *Id.* (footnote omitted). In contrast here, the recent information fails to update the older information because the new information does not show drug trafficking occurred at the Aldergate Way apartment and the older information does not establish an ongoing drug operation at a secure operational base.

### 5. *Franks* Hearing

"In a *Franks* hearing, a court determines whether to suppress the fruits of an executed search warrant, where the warrant was the result of a false statement." *United States v. Crawford*, 943 F.3d 297, 309 (6th Cir. 2019) (citing *Franks v. Delaware*, 438 U.S. 154, 171 (1978)). "A defendant challenging the validity of a search warrant's affidavit bears a heavy burden." *United States v. Bateman*, 945 F.3d 997, 1008 (6th Cir. 2019). He "must make a 'substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit.'" *Crawford*, 943 F.3d at 309 (quoting *Franks*, 438 U.S. at 171). "'The allegedly false statement,' moreover, must be 'necessary to the finding of probable cause.'" *Id.* (quoting *Franks*, 438 U.S. at 171). Indeed, an affidavit supporting a search warrant is presumed to be valid. *Franks*, 438 U.S. at 171.

A material omission may also warrant a *Franks* hearing, but "an affidavit which omits potentially exculpatory information is less likely to present a question of impermissible official conduct than one which affirmatively includes false information." *United States v. Adkins*, 107 F.3d 1213, 1217 (6th Cir. 1997) (citation omitted). This is because an affidavit need not include all facts gathered over the course of an investigation. *Id.* Thus, "except in the very rare case where the defendant makes a strong preliminary showing that the affiant *with an intention to mislead* excluded critical information from the affidavit, and the omission is critical to the finding of probable cause, *Franks* is inapplicable to the omission of disputed facts." *Mays v. City of Dayton*,

38

134 F.3d 809, 816 (6th Cir. 1998). A heightened standard is necessary for omissions to foreclose "'endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit.'" *United States v. Martin*, 920 F.2d 393, 398 (6th Cir. 1990) (quoting *United States v. Colkley*, 899 F.2d 297, 301 (4th Cir. 1990)). "If the defendant does succeed in making a preliminary showing that the government affiant engaged in 'deliberate falsehood' or 'reckless disregard for the truth' in omitting information from the affidavit, the court must then consider the affidavit including the omitted portions and determine whether probable cause still exists." *Adkins*, 107 F.3d at 1217 (citation omitted).

Whether because of an alleged false statement or material omission, a defendant seeking a *Franks* hearing must make a substantial showing that the affiant intentionally or recklessly included or omitted it from the affidavit. *Butler v. City of Detroit*, 936 F.3d 410, 418 (6th Cir. 2019). A statement in the affidavit "is only considered to be issued with 'reckless disregard for the truth' if the defendant shows the affiant subjectively 'entertained serious doubts as to the truth of his allegations.'" *Bateman*, 945 F.3d at 1008 (6th Cir. 2019) (cleaned up) (quoting *United States v. Cican*, 63 F. App'x 832, 836 (6th Cir. 2003)). "'Allegations of an officer's negligence or innocent mistake are insufficient.'" *Id*. (cleaned up) (quoting *Franks*, 438 U.S. at 171).

The "well-settled framework for *Franks* hearings requires a defendant to 'point to specific false statements,'" in the affidavit he claims are false or state the alleged omission. *United States v. Green*, 572 F. App'x 438, 442 (6th Cir. 2014) (cleaned up) (citation omitted). Here, Defendants argue that the following statement is false [Doc. 132 p. 9–10]: "Also recovered from DAVIS was a key to at [sic] 9310 Aldergate Way, Apartment #4107, which is the apartment investigators are seeking to search" [Doc. 138-1 p. 4].

Defendants argue that the key seized from Defendant Davis's person did not bear any markings to connect it to the apartment [Doc. 132 p. 10]. At the evidentiary hearing, Defendants introduced the testimony of Ms. Bowman who testified that she is familiar with the keys issued to residents at the Aldergate Way apartments and that those keys do not have any identifying marks indicating which apartment they open [Doc. 229 pp. 60–62]. Defendants also introduced photographs of a set of keys similar to those used at the Aldergate Way apartments, showing that they do not have identifying marks [*Id*. at 61–62; Exhs. 106 & 107]. Investigator Rogers further testified on cross-examination that he did not remember whether the key found on the driver's seat had any markings to link it to a particular a residence, but he did recall the key fob had a white label or tape on one side [Doc. 229 pp. 49–50].

The Court finds Defendants have not demonstrated that this statement in the affidavit is false. The affidavit does not state that officers knew the key seized from Davis was to apartment 4107 because of identifying marks on the key, and Ms. Bowman acknowledged on cross-examination that residents can mark their own keys [*See id*. at 64]. Moreover, even if this statement is false, Defendants provide no evidence that it was deliberately or recklessly made. Instead, the proof presented at the evidentiary hearing shows that Defendant Davis's driver's license, obtained and photographed during the stop, gives her address as the Aldergate Way apartment [Exh. 5]. Thus, the officers would have no need to falsify information linking Defendant Davis to the apartment.

Defendants also allege a material omission [Doc. 132 p. 10]. They contend that the affiant omitted information that the confidential informant is "part of the criminal milieu while in an intimate relationship with Wilson" [*Id.*]. Defendants presented no information, other than the bare statement in their brief, that this is the case. To make a prima facie case for a *Franks* hearing, a

defendant's allegations of deliberate or reckless falsehood or omission "must be accompanied by an offer of proof." *Franks*, 438 U.S. at 171.

Accordingly, the undersigned finds that Defendants have failed to carry their burden of showing the affidavit contains a deliberately or recklessly false statement or a material omission.

### 6. Good Faith

Looking at the totality of the facts and circumstances alleged in the affidavit, the undersigned finds the affidavit fails to provide probable cause to search the Aldergate Way apartment for evidence of drug trafficking. The affidavit contains substantial evidence that Defendants Scales and Davis were trafficking in illegal drugs. Law enforcement interrupted a drug transaction and shortly thereafter seized suspected heroin, packaged for individual sales, and a large amount of currency from their vehicle and more suspected heroin packaged for resale from Defendant Davis's person. This occurred only hours before Detective Sharp sought the search warrant. The affidavit also establishes that Defendant Davis lived at the apartment based upon the key to the apartment seized from her person. The affidavit, however, fails to establish a fair probability that evidence of drug trafficking would be found at the apartment. The information from the confidential source that the DTO stored drugs at the apartment is of questionable reliability and unknown age. The sole remaining link—that based upon the affiant's training and experience, drug traffickers store contraband, proceeds, and records of drug sales in their residences [Doc. 138-1 p. 6]—is, by itself, insufficient to establish a nexus with the apartment. Accordingly, the search of the apartment violated Defendants' Fourth Amendment rights. But the analysis does not end here.

The Court next determines whether the evidence seized from the apartment must be suppressed. "When police act under a warrant that is invalid for lack of probable cause, the

exclusionary rule does not apply if the police acted 'in objectively reasonable reliance' on the subsequently invalidated search warrant." *United States v. Herring*, 555 U.S. 135, 141–42 (2009) (quoting *United States v. Leon*, 468 U.S. 897, 922 (1984)) (rejecting automatic exclusion of evidence and, instead, asking whether exclusion will provide "appreciable deterrence"). This is because "'[p]enalizing the officer for the [judge's] error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations.'" *United States v. White*, 874 F.3d 490, 505–06 (6th Cir. 2017) (quoting *Leon*, 468 U.S. at 921).

For nearly forty years, the Supreme Court has recognized a "good faith exception" to the exclusionary rule, finding "suppression [of the evidence seized in the execution of a search warrant] is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored a reasonably objective belief in the existence of probable cause." *Leon*, 468 U.S. at 926. The good-faith exception does not apply in the following circumstances:

> (1) if the issuing magistrate was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth;
>
> (2) if the issuing magistrate wholly abandoned his judicial role;
>
> (3) if the affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable, or in other words, where the warrant application was supported by [nothing] more than a "bare bones" affidavit;
>
> (4) if the warrant may be so facially deficient—i.e., failing to particularize the place to be searched or the things to be seized— the executing officers cannot reasonably presume it to be valid[.]

*United States v. Bullard*, 659 F. App'x 288, 293–94 (6th Cir. 2016) (citations omitted). Defendants Scales and Davis argue that Detective Sharp's affidavit was a "bare bones" affidavit such that no

officer could reasonably believe it contained probable cause to search the apartment for evidence of drug trafficking [Doc. 177 p. 7; Doc. 218 pp. 1–2].[10]

A "bare bones affidavit" is one that states "only 'suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge[.]'" *United States v. Laughton*, 409 F.3d 744, 748 (6th Cir. 2005) (quoting *United States v. Weaver*, 99 F.3d 1372, 1378 (6th Cir. 1996)). A bare bones affidavit makes only conclusory allegations of probable cause without facts in support of those conclusions. *United States v. Williams*, 224 F.3d 530, 533 (6th Cir. 2000). "An officer's belief that there is a sufficient nexus between the suspected crime and the place to be searched is unreasonable when evidence in the affidavit connecting the crime to the residence is 'so vague as to be conclusory or meaningless.'" *United States v. Frazier*, 423 F.3d 526, 536 (6th Cir. 2005) (quoting *Carpenter*, 360 F.3d at 595–96).

To find the affidavit qualifies as bare bones, the Court must find more than the search warrant was not supported by probable cause; instead, it must determine that the affidavit contains "no reasonable grounds for believing that the warrant was properly issued.'" *White*, 874 F.3d at 506 (quoting *Leon*, 468 U.S. at 922–23). "[A] minimally sufficient nexus exists if the reviewing court is able to identify in the averring officer's affidavit some connection, regardless of how remote it may have been—some modicum of evidence, however slight—between the criminal activity at issue and the place to be searched." *United States v. Tucker*, 742 F. App'x 994, 999 (6th

---

[10]     In his reply brief, Defendant Scales argues that the good-faith exception does not apply based on the first and third points [Doc. 177 p. 7]. In his post-hearing brief, however, Defendant argues only the third criterion: that the affidavit is 'bare bones' rendering law enforcement's reliance on the warrant unreasonable. Having found the search warrant does not contain a deliberate or recklessly false statement or a material omission, the undersigned finds the first criterion, that the issuing judge was misled by information in the affidavit, does not apply.

43

Cir. 2018) (cleaned up) (citation omitted). The Court must also be mindful that affidavits are drafted by law enforcement officers, not lawyers, "in the midst and haste of a criminal investigation," and thus, should not be interpreted in a "hypertechnical manner." *Weaver*, 99 F.3d at 1378 (internal quotation omitted).

Here, Detective Sharp's affidavit provides a minimal nexus between the Aldergate Way apartment and the Defendants' drug trafficking. The affidavit states that for the last eighteen months, law enforcement investigated a DTO led and managed by Martez Wilson [Doc. 138-1 p. 3]. The CS, who is in an intimate relationship with Wilson, told investigators that Wilson, Defendants, and others "were operating a large drug organization which included the transport of significant quantities of heroin and bulk cash between Knoxville, Tennessee, and the Detroit, Michigan area" [*Id*. at 4]. The CS also told officers that when in Knoxville, Wilson and the Defendants store illegal drugs and currency in the apartment where the Defendants live and that the apartment is rented by a person named Emily [*Id*.]. The CS provided a photo of Emily [*Id*.]. Through public information sources and law enforcement databases, law enforcement corroborated that Emily Long rents the Aldergate Way apartment and resides there [*Id*.]. Finally, on November 10, 2021, the day the search warrant was sought, Defendants Davis and Scales were stopped in Knoxville, Tennessee, following an interrupted drug transaction, and heroin packaged for resale was seized from their vehicle and Davis's person [*Id*. at 3–4]. The overarching investigation of the Wilson DTO, the apartment key connecting Defendant Davis to the apartment, and the individually packaged drugs seized from the vehicle and Davis, while the Defendants were in Knoxville, are specific facts, rather than conclusory statements, supporting CS's statement that the Defendants store drugs in the apartment and showing the affidavit is not bare bones. *See United States v. Christian*, 925 F.3d 305, 312 (6th Cir. 2019) (en banc) (explaining that courts "reserve

[the bare bones] label for an affidavit that merely 'states suspicions, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge'" (citation omitted)).

Two recent cases in this Circuit address whether the good-faith exception applies to an affidavit that alleges drug-trafficking activity but fails to establish a nexus to the defendant's residence. The Court finds these cases support application of the good-faith exception here.

In *United States v. Sanders*, the Sixth Circuit found insufficient probable cause based upon the uncorroborated, undated statement by a confidential informant, whose reliability and basis of knowledge were unknown, that defendant was selling drugs from the apartment, two controlled buys that occurred away from the apartment, and the failure to demonstrate that defendant lived at the apartment. 59 F.4th at 238–40. The Court also declined to apply the good-faith exception, finding evidence that law enforcement saw the defendant traveling between the apartment they sought to search and the locations of drug transactions did not provide minimal evidence of a nexus. *Id*. at 241. It stated that in the absence of reliability, veracity, and basis of knowledge, "'no reasonable officer would place much, if any weight on' the CI's tip." *Id*. at 244 (quoting *United States v. Helton*, 314 F.3d 812, 821–22 (6th Cir. 2003)). It also found the absence of any drug activity at the apartment to be significant, along with law enforcement's complete failure to take simple steps to establish that the defendant lived at the apartment. *Id*. at 245 ("In considering the reasonableness of the officers' reliance on the warrant, it is impossible to ignore the ease with which officers could have uncovered [d]efendant's connection to the . . . apartment."). The court concluded that "a reasonable officer would understand that further corroboration—such as independent surveillance of the apartment or further questioning of the informant to determine

45

whether he had seen drugs inside the apartment—was needed before probable cause could be established to search the . . . apartment." *Id*.

In *United States v. Grant*, the Sixth Circuit found the affidavit failed to provide probable cause to search a storefront and residence rented by the defendant based upon a single controlled buy away from the location to be searched and occurring a month and one-half earlier. 2023 WL 119399, at *3. The Court observed that the affidavit did not show the defendant to be a "known drug dealer," "provide evidence of 'a large, ongoing drug trafficking operation,'" or allege "'recent, reliable evidence of drug activity.'" *Id*. (quoting *Brown*, 828 F.3d at 383 n.2). The Court also found the affidavit did not provide a minimal nexus between the location to be searched and evidence of drug trafficking to support a finding of good faith. *Id*. at *5. The sole fact connecting the location to drug activity was that defendant parked at the location before walking to deliver drugs at another place. *Id*. "Although [the affiant] discussed his training and experience and subsequent conclusion that [the defendant's] visits to [the storefront and apartment] indicated drug trafficking, this inference alone cannot support probable cause[, which instead must] be supported by some reference to drug activity at the residence." *Id*.

In contrast to *Sanders* and *Grant*, here, Detective Sharp's affidavit alleged an ongoing drug trafficking operation. The CS stated the Defendants stored controlled substances and cash in the apartment, which provides a link between drug activity and the residence. Officers corroborated the CS's information that Emily leased the apartment, which lends support to the CS's statement about drugs being stored there. The Defendants' drug-trafficking activity was further corroborated by the items uncovered in the search of the Jeep. Law enforcement could also reasonably infer that the CS knew the DTO stored drugs in the apartment based upon her close relationship with Wilson. *See White*, 874 F.3d at 500 ("[R]easonable inferences that are not sufficient to sustain probable

cause in the first place may suffice to save the ensuing search as objectively reasonable."). In addition, officers established that Defendant Davis lived at the apartment because they seized keys to the apartment from her person. This corroborated the information from the CS that Defendant lived at the apartment when in Knoxville. While the affidavit fails to prove that the CS is reliable or state the CS's basis of knowledge, it provides some independent police corroboration of her information, just not the substantial corroboration needed to survive constitutional scrutiny.

In his post-hearing brief on the application of the good-faith exception, Defendant Scales discusses a number of cases "where the good faith exception has not saved a search warrant that was so lacking in indicia of probable cause that official belief in its existence was unreasonable" [Doc. 218 pp. 2–9]. He also discusses a number of cases "where probable cause did not exist because the nexus between the criminal activity and the place to be searched was lacking, yet the Court upheld the search under the good faith exception" [*Id.* at 9–15]. The Court has reviewed the cited cases and Defendant's argument concerning application of these cases, and they do not persuade a different recommendation here. Whether the good-faith exception applies turns on the facts and circumstances of the particular case. *United States v. Buffer*, 529 F. App'x 482, 486 (6th Cir. 2013) ("'[S]uppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule.'" (quoting *Leon*, 468 U.S. at 918)).

For the reasons explained, the undersigned finds that the good-faith exception applies in this case.

## IV. CONCLUSION

The undersigned finds law enforcement had reasonable suspicion to stop the Defendants' vehicle and the detention of the Defendants was not unduly prolonged. The undersigned further

finds that the search warrant for the Aldergate Way apartment was not validly issued because the supporting affidavit fails to provide a nexus between the apartment and drug trafficking and the information from the confidential informant is of questionable reliability and stale. The undersigned concludes, however, that the evidence seized in the execution of the search warrant need not be suppressed because the officers relied on the search warrant in good faith.

Accordingly, the undersigned respectfully **RECOMMENDS** that the District Judge deny Defendant's Scales Motion and Memorandum to Suppress Evidence Seized at 9310 Aldergate Way, Apt. #4107 [**Doc. 132**] and Defendant Davis's Motion and Memorandum of Law to Suppress Evidence Seized as the Result of a Traffic Stop [**Doc. 134**].[11] The undersigned also **RECOMMENDS** that the District Judge grant the motions to adopt by Defendants Davis [**Doc. 133**], Scales [**Doc. 135**], and Sharde Simmon [**Doc. 137**] because the Defendants have demonstrated standing to join in the specified motions. With respect to Defendant McDaniels's motion to join [**Doc. 136**], the undersigned **RECOMMENDS** that the District Judge grant the motion in part, in that he be permitted to join in Defendant Davis's motion to suppress related to

---

[11] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to appeal the District Court's order. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th Cir.), *cert. denied*, 555 U.S. 1080 (2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). "[T]he district court need not provide *de novo* review where objections [to this report and recommendation] are [f]rivolous, conclusive, or general." *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986) (internal quotation omitted). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed. of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

48

the stop of the Jeep, and withdrawn in part because he no longer seeks to join Defendant Scales's motion suppress related to the apartment.

Respectfully submitted,

Jill E. McCook
United States Magistrate Judge